UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

**FILED**

OCT 1 2 2016

TIMOTHY M. O'BRIEN CLERK
By_____Deputy

| | | |
|---|---|---|
| ROBERT D. ORR | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 16-CV-2694-CM-GLR |
| | ) | |
| HUSCH BLACKWELL, LLP | ) | |
| and DOUGLAS J. SCHMIDT | ) | |
| and JOHN J. CRUCIANI | ) | |
| Defendants. | ) | |

## COMPLAINT

Robert D. Orr ("Plaintiff" or "Orr") for his complaint ("Complaint") alleges as follows against law firm Husch Blackwell, LLP, Douglas J. Schmidt a partner of Husch Blackwell, LLC and John J. Cruciani, a partner of Husch Blackwell (collectively "Defendants" or "Husch"). Orr states and alleges as follows:

## PRELIMINARY STATEMENT

1.     Franchise loans are worthless without franchise support. Orr was an officer and a director of two publicly traded companies with large investments in franchise loans that failed because franchise support was halted by Husch.

2.     Orr's professional and financial well-being depended on preserving the quality of franchise loans primarily by: i) protecting the franchise royalties used to pay for franchise support, and ii) retaining a backup servicer to take over franchise support in the event of financial crisis.

3.     Orr was sued by franchise loan investors in a dispute regarding Orr's collection of past due fees from investors for services provided to troubled franchise borrowers.

4.     Orr was sued during the month of the most chaotic financial time in recent history. Orr therefore proposed appointment of a special master to maintain the status quo during resolution of the dispute between Orr and investors: i) by ensuring uninterrupted franchise support pursuant to an existing security agreement protecting franchise royalties, and ii) pursuant to an existing servicing agreement providing backup franchise support.

1

5.      With Orr's consent, the District Court issued an order approving Orr's proposal to appoint a special master and Husch was retained.

6.      Contrary to the District Court's order, Orr's written protests and the existing security agreement, Husch halted franchise support activities in order to hoard monthly franchise royalties (intended for payment of franchise support expenses) for payment of Husch's legal fees.

7.      Contrary to the District Court's order, Orr's written protests and the existing servicing agreement, Husch refused to require the backup servicer to take over franchise support (because doing so would require that franchise royalties be paid to the backup servicer instead of hoarded for payment to Husch).

8.      Husch solved the age old problem of special master compensation by hoarding monthly franchise royalties to pay Husch's fees <u>at the ultimate cost of destroying thousands of lives and numerous businesses by halting franchise support to franchise borrowers.</u>

9.      Losses caused by Husch's hoarding of monthly franchise fees resulted in bankruptcy filings and Husch engineering its appointment as legal counsel and trustee for the bankruptcy estates.  These appointments allowed Husch to delay and impede the filing of this Complaint.

10.     The following table is provided as a guide to Husch's misconduct because the failed supervision of Husch by the U.S. Trustee has delayed the filing of this Complaint by several years which included many intervening events and which therefore requires a guide for better understanding.

| SUMMARY | |
|---|---|
| ¶11-15 | Orr's Affiliations Summary |
| ¶16-30 | Orr's Litigation Summary |
| ¶31-40 | Orr's Involvement Summary |
| ¶41-54 | Case Summary |
| PARTIES | |
| JURISDICTION AND VENUE | |
| BACKGROUND | |
| ¶64-94 | Pre-Bankruptcy Background |
| ¶95-109 | Post-Bankruptcy Background |
| CREDIT ENHANCEMENT | |
| ¶112-115 | Credit Enhancement Established by Orr to Ensure the Status Quo with Uninterrupted Franchise Support |
| ¶116-121 | Royalties Safeguard was Important Credit Enhancement |
| ¶122-129 | Backup Safeguard was Important Credit Enhancement |
| ¶130-134 | Assistance Safeguard was Disputed Credit Enhancement |
| ORR'S CONSENT TO COURT'S SPECIAL MASTER APPOINTMENT AND HUSCH EMPLOYMENT | |
| ¶135-139 | Special Master Duties Defined Pursuant to Rule 53 |
| ¶140-143 | Powers Granted for Performance of Special Master Duties Pursuant to Rule 53 |
| ¶144-148 | Special Master and Husch are One and the Same |
| FIRST DUTY OF SPECIAL MASTER AND HUSCH WAS TO ENSURE THE STATUS QUO AS SET OUT | |

| BY THE EXISTING DOCUMENTS | |
|---|---|
| ¶149-155 | Special Master was Appointed to perform the Duty of Ensuring the Status Quo during Resolution of the Assistance Safeguards Dispute using the Backup Safeguard and Royalties Safeguard |
| ¶156-158 | Special Master and Husch Hoarded Franchise Royalties by Refusing to Implement the Backup Safeguard and Royalties Safeguard |
| **SECONDARY DUTIES OF SPECIAL MASTER BECAME MEANINGLESS WHEN THE SPECIAL MASTER AND HUSCH REFUSED TO PERFORM THE FIRST DUTY OF ENSURING STATUS QUO** | |
| ¶160-161 | Duty to Assist in Resolving Dispute Regarding Assistance Safeguards |
| ¶162-163 | Duty to Assist in Preparation of SEC Reports |
| ¶164-167 | Duty to Promote Corporate Governance |
| ¶168-169 | Duty to Not Select Brooke Capital CEO |
| ¶170-171 | Duty to Report and Disclose |
| **HUSCH DENIED LEGAL REPRESENTATION TO ORR DESPITE ORDERS TO THE CONTRARY AND IGNORED ORR'S STATED LEGAL POSITION** | |
| ¶172-178 | Husch Denied Legal Representation to Orr |
| ¶179-181 | Husch Ignored Orr's Legal Position Regarding Securitization Documents |
| **ALLEGATIONS CENTER ON ORR'S DESPERATE PROTESTS MADE FROM OCTOBER 2, 2008 UNTIL OCTOBER 9, 2008** | |
| ¶184 | October 2, 2008 Withdrawal of Representation by Kutak Rock, LLP |
| ¶185-186 | October 2, 2008 Protests |
| ¶187-188 | October 3, 2008 Protests |
| ¶189-190 | October 4, 2008 Protests |
| ¶191-192 | October 5, 2008 Protests |
| ¶193-194 | October 6, 2008 Protests |
| ¶195-196 | October 8, 2008 Protests |
| ¶197 | October 9, 2008 Cessation of Franchise Support |
| **HUSCH INTENTIONALLY IGNORED ORR'S PROTESTS TO AVOID SCRUTINY OF ITS IMPROPER AND UNJUST ACTIONS** | |
| ¶198-199 | Husch Ignored Orr's Protests |
| ¶200-204 | Husch Ignored Orr's Protests so Franchise Royalties Could be Hoarded by the Special Master Estate and then Used to Pay Husch's Fees |
| ¶205-207 | Husch Ignored Orr's Protests in order to cause Bankruptcy by Hoarding Franchise Royalties and thereby Generate Unconscionable Amount of Fees from the Bankruptcy Estates |
| ¶208-212 | Husch Ignored Orr's Protests so that Special Master Powers could be used to Engineer Husch's Appointment as Legal Counsel for the Bankruptcy Estates and thereby Protect Husch from Liability for Hoarding Franchise Royalties to Pay Husch's Fees |
| ¶213-215 | Husch Lacks Credibility in this Matter |
| **HUSCH IMPROPER USE OF BANKRUPTCY ESTATES TO IMPACT, DELAY AND IMPEDE THE FILING OF THIS COMPLAINT** | |
| ¶216-219 | Orr has Appealed Bankruptcy Court Rulings which Improperly Allowed Husch to use Bankruptcy Estates to Impact, Delay and Impede this Complaint |
| ¶220-222 | Improper Appointment of Husch as Legal Counsel of the Bankruptcy Estates in order to Improperly Use Bankruptcy Estates to Impact this Complaint |
| ¶223-225 | Use of Bankruptcy Estate Assets to Purchase Expert Report Exonerating Husch from Orr's Complaint Allegations |
| ¶226-228 | Use of Bankruptcy Estate Assets to File an Adversary Proceeding against Orr's Family to Delay the Filing of this Complaint |
| ¶229-232 | Use of Bankruptcy Estate Assets to File an Adversary Proceeding Against Orr to Impede Prosecution of Previous Shareholder Derivative Litigation Implicating Husch |
| ¶233-235 | Use of Bankruptcy Estate Assets to Financially Starve Orr to Deny Legal Representation and to Prevent the Filing of this Complaint |
| ¶236-248 | Orr's Regulatory Complaints to the U.S. Trustee regarding Husch's use of Bankruptcy Estates to Impact, Delay and Impede this Complaint |
| **COUNTS** | |
| ¶249-260 | Count I- Negligence, Malpractice and Breach of Fiduciary Duties by Failing to Perform Agreed Upon Duties |
| ¶261-276 | Count II-Gross Negligence and Intentional Misconduct from Ignoring Orr's Protests |

| ¶277-288 | Count III-Fraud by Intentionally Concealing Facts to Avoid Scrutiny of its Hoarding of Franchise Royalties |
|---|---|
| ¶289-300 | Count IV-Fraud by Intentionally Concealing Orr's Protests to Engineer Husch's Appointment as Bankruptcy Estates Legal Counsel |
| ¶301-309 | Count V-Fraud by Intentionally Omitting Cause of Action against Husch as an Asset in Bankruptcy Schedules Prepared by Husch |
| ¶310-314 | Count VI-Unjust Enrichment of Husch from use of Franchise Royalties for Payment to Husch which Denied Benefits to Orr |
| ¶315-323 | Count VII-Conversion by Husch of Funds Due to Orr and other Beneficiaries of Trust Administered by BNYM |

## SUMMARY

### Orr's Affiliations Summary

11.     Orr was an officer and director of Brooke Corporation, a holding company traded on the NASDAQ under symbol BXXX.

12.     Brooke Corporation's largest investment was in Aleritas Capital Corp, a franchise lender traded on the AMEX under symbol BRCR ("Aleritas").  Orr's professional and financial well-being depended primarily on the quality of Aleritas' franchise loans and the quality of Aleritas' franchise loans depended on the franchise support provided to franchise borrowers by franchise servicers.

13.     Brooke Corporation also held a smaller investment in Brooke Capital Corporation, a franchise servicer traded on the AMEX under symbol BCP ("Brooke Capital").  Brooke Capital, aka First American Capital Corporation, provided franchise support to insurance agents and funeral home operators.  Orr's professional and financial well-being also depended to a lesser (but still significant) extent on Brooke Capital's ability to provide franchise support.

14.     Brooke Corporation owned 100% of Brooke Agency Services Company ("BASC").  BASC was a bankruptcy remote entity organized at the direction of Orr to provide credit enhancement services (e.g. franchise royalties safeguards, backup franchise servicer safeguards and troubled borrower assistance safeguards) to franchise lenders.

15.     The following chart is provided as a guide to Orr's affiliations.



**Orr's Litigation Summary**

16.     On September 11, 2008 Orr was sued by investors in securitized, or pooled, franchise loans

originated by Aleritas (Doc #1, KSB #08-2424).  This lawsuit was in response to Orr's efforts to collect

fees owed to BASC by securitization investors for financial/management assistance provided to troubled

franchise borrowers.  The corresponding complaint identified Orr as the instigator of improper collection

methods on behalf of BASC, making Orr the primary defendant.  Orr was eventually paid by

securitization investors (Doc #94, Case #10-2994) to settle Orr's countering allegations that securitization

investors exaggerated their securitization investment yields by purposely delaying the payment of fees to

BASC for financial/management assistance provided to troubled borrowers.

17.     On September 15, 2008 Orr proposed appointment of a special master in order to quickly resolve

his dispute with securitization investors while ensuring the status quo (Doc #17, KSD #08-2424).

18.     On September 16, 2008 the District Court appointed Albert Riederer ("Riederer") as special

master to "...ensure the status quo as set out by the existing documents..." during resolution of the

dispute (Doc #21, KSD #08-2424).

19.     On September 17, 2008 the District Court supplemented its September 16, 2008 order (Doc #23,

KSD #08-2424) to more specifically define: i) the duties of the special master, and ii) the powers granted

to the special master to perform those duties.  As the primary defendant in this litigation, Orr consented to

the designation of specific special master duties and the granting of extraordinary powers to perform

those duties.

20.     Brooke Corporation and Brooke Capital were part of a special master estate created to facilitate

performance of the first assigned duty to "...ensure the status quo..." (Doc #21, 23, KSD #08-2424).  As

the primary defendant in this litigation, Orr consented to creation of a special master estate as the

mechanism for granting extraordinary powers in order to perform the first assigned duty of ensuring the

*status quo.*

21.     Riederer retained Husch to counsel and assist in the performance of the special master duties

(Doc #23, KSD #08-2424).  As the primary defendant in this litigation, Orr consented to the retention of

Husch.

22.     While part of the special master estate under the control of Riederer and Husch, Brooke

Corporation and Brooke Capital filed for bankruptcy on October 28, 2008.  Using the extraordinary

powers granted to Riederer and Husch, Husch engineered Riederer's appointment as trustee of the jointly

administered bankruptcy estates (Doc #5, 20, KSB #08-22786) and Husch engineered their appointment

as legal counsel (Doc #41, #207, KSB #08-22786).

23.     On August 11, 2010 Orr sued Riederer for tortious interference on behalf of himself and for gross

negligence (as shareholder derivative allegations) on behalf of Brooke Capital (Doc #1-1, KSD #10-

1303).  Orr's suit alleged that Riederer did not *"...ensure the status quo..."* as ordered by this Court and

misused the extraordinary powers granted for the purpose of ensuring the status quo.  Orr's tortious

interference claims were dismissed without consideration of the merits of Orr's allegations because the

District Court found that Riederer did not act with malice (Doc #135, KSD #10-1303).  The shareholder

derivative allegations languished because Husch blocked the bankruptcy estates from participating in

Orr's lawsuit (Doc #4, KSB #11-6147).

24.     On October 26, 2010, Riederer and Husch filed an adversary proceeding on behalf of the

bankruptcy estates against Orr's wife, son, son-in-law, mother-in-law and brother-in-law (Doc #1, KSB

#10-6225) based on a cause of action, and supported by an expert report, which exonerated Riederer and

Husch from Orr's allegations of misconduct.  Orr repeatedly complained to the U.S. Trustee of Husch's

conflicts of interest as exemplified by this circumstance (Exhibit A).

25.     On May 6, 2011 Husch filed an adversary proceeding on behalf of the bankruptcy estates seeking

to block Orr's lawsuit against Riederer which implicated Husch.  As the result of Riederer and Husch

representing both the special master estate and the bankruptcy estates, Husch argued in this adversary

proceeding that the special master estate and bankruptcy estates are fused together and therefore the estates are one and the same. (Doc #4, KSB #11-6147)  Orr repeatedly complained to the U.S. Trustee of Husch's conflicts of interest as exemplified by this surreal circumstance (Exhibit A).

26.     Orr consented to an enforcement action for filing false reports with the Securities and Exchange Commission ("SEC").  When ruling on April 17, 2012 on the associated civil money penalties (KSD #53, Case #11-2251), the District Court found that the filing of false SEC reports did not cause losses.

27.     Orr also pled guilty to filing a false SEC report in an affiliated criminal action (Doc #28, KSD #12-40121).  When adopting the associated report on October 7, 2013 (Doc #34, KSD #12-40121), the District Court found that the filing of a false SEC reports did not cause losses.

28.     Orr has pled to omitting from Brooke Corporation's December 31, 2007 SEC report, *"The specific number of failed Brooke Capital Corporation franchise locations"* and *"The exact or total amount of financial assistance being provided by Brooke Capital Corporation to under-performing franchises."* which *"presented a more financially robust position for Brooke Corporation's investment in Brooke Capital Corporation…than was supported by actual financial conditions…"* (Doc #28, KSD #12-40121).

29.     Immediately after the July 24, 2015 settlement of adversary proceeding #10-6225 against Orr's family, Orr began a concerted effort to obtain Husch cooperation, or Bankruptcy Court approval, for the bankruptcy estate to appoint special counsel to review the allegations in this Complaint and, if warranted, join Orr in making shareholder derivative allegations against Husch.  On August 17, 2016, the Bankruptcy Court refused Orr's motion for cooperation in this matter (Doc #5760, KSB #08-22786).  As such, Orr is filing this Complaint without asserting shareholder derivative claims on behalf of Aleritas, Brooke Corporation or Brooke Capital.

30.     Based on conflicts of interest emanating from the allegations in this Complaint, Orr has appealed Bankruptcy Court's decisions: i) refusing Orr's request to appoint special counsel to review Husch's conflicts of interest and to participate in this Complaint if deemed warranted (KSD #16-2600); ii) sustaining Husch objection to Orr's promissory note claim to prevent Orr's use of proceeds to prosecute

this Complaint (KSD 16-2273, KSD #16-2274), and; iii) refusing Orr's request to order refund of fees by Husch to the bankruptcy estates to partially remedy Husch's conflicted administration (KSD #16-2599).

**Orr's Involvement Summary**

31.     Orr's involvement in this matter began when securitization investors identified him as the primary defendant in a lawsuit which resulted in Orr's consent to the establishment of a special master estate as the mechanism for granting extraordinary powers to Husch for the purpose of maintaining the status quo during resolution of Orr's dispute with securitization investors during chaotic financial times.

32.     Orr was sued by securitization investors for actions he took as an officer and director of Aleritas, Brooke Corporation and Brooke Capital.

33.     Orr was identified by securitization investors as the primary defendant in their lawsuit as the result of Orr's efforts to collect past due fees from securitization investors for financial/management assistance provided to troubled borrowers.

34.     Orr was the primary consenter to the establishment of a special master estate controlled by Husch because he was the primary defendant in the underlying lawsuit by securitization investors.

35.     Husch has tied the initial special master estate to the subsequent bankruptcy estate by their continuous and uninterrupted representation of Brooke Corporation and Brooke Capital from the September 16, 2008 establishment of the special master estate to the current day administration of the bankruptcy estates.

36.     Husch has tied the initial special master estate to the subsequent bankruptcy estate by their assertion that the two estates are fused.  This assertion was made in a Bankruptcy Court adversary proceeding filed by Husch for the purpose of blocking District Court litigation filed by Orr which implicated Husch.

37.     As a result of Husch fusing the special master estate with the bankruptcy estate, Orr's consent to the establishment of a special master estate involves him in the bankruptcy estate.  As such, Orr's personal involvement in Brooke Corporation and Brooke Capital has been continuous and uninterrupted since initial establishment of the special master estate.

38.     Orr's personal involvement has resulted in damages from Husch's pre-bankruptcy misconduct which includes a failure to provide corporate indemnification to Orr and denying professional opportunities to Orr.

39.     Orr's continuous personal involvement has resulted in damages from Husch's post-bankruptcy misconduct to financially starve Orr and prevent the filing of this Complaint. Attempts to resolve these matters in Bankruptcy Court has resulted in the delay this Complaint and in the pending appeals of three Bankruptcy Court decisions.

40.     Although the other consenting defendants (Aleritas, Brooke Corporation and Brooke Capital) have derivative causes of action, Husch has thus far prevented prosecution of shareholder derivative allegations (Doc #5760, KSB #08-22786).  In the event that Orr prevails in his appeal to the District Court in this regard (KSD #16-2600), then Orr expects to amend this Complaint to include shareholder derivative allegations in addition to his personal allegations.

**Case Summary**

41.     Aleritas sold many of its franchise loans as investments in franchise loan securitization pools and as participations in individual franchise loans.  Aleritas, and the purchasers of Aleritas' franchise loans, relied on a franchise servicer to provide franchise support to franchise borrowers to sustain franchise loan quality.

42.     Orr had begun preparations in June 2002 for possible financial chaos by directing the organization of BASC, a bankruptcy remote special purpose entity, for the purpose of maintaining the status quo during financial calamity with security agreements and servicing agreements ensuring the continuation of franchise support to franchise borrowers.

43.     In July 2006 Orr directed implementation by BASC of a security agreement ensuring the status quo by requiring that franchise royalties be paid (without delay) to franchise servicers to provide franchise support (Exhibit H).

44.     In July 2006 Orr directed establishment by BASC of a servicing agreement ensuring the status quo by retaining TBSIA, a subsidiary of Textron Business Services, to back-up the original franchise

servicer (Brooke Capital) and provide (<u>without delay</u>) franchise support to franchise borrowers in the event of financial calamity (Exhibit I).

45.     In August 2008 Orr demanded that proceeds from payments on securitized loans be used to pay the past due securitization fees owed by securitization investors to the franchise servicer providing financial/managerial assistance to troubled franchise borrowers.  A dispute between Orr and securitization investors ensued.

46.     In September 2008 securitization investors filed a lawsuit against Orr alleging that the use of payments on securitized loans to pay past due securitization fees was an act of misappropriation by Orr. The result was sensationalized press coverage that caused financial calamity for Orr, Brooke Corporation, Aleritas and Brooke Capital during the middle of the 2008 financial crisis.

47.     As a result of the chaotic times, Orr requested that a special master be appointed to calm stakeholders and preserve the companies during resolution of Orr's dispute with securitization investors. On September 16, 2008 and September 17, 2008 the District Court ordered appointment of a special master to *"...ensure the status quo as set out by the existing documents..."* until Orr's dispute with securitization investors was resolved.  (Doc #21, KSD #08-2424) (Doc #23, KSD #08-2424)

48.     From October 2, 2008 to October 8, 2008 Orr made numerous written protests to Husch that it was failing to maintain the status quo: i) by refusing to use franchise royalties to <u>immediately</u> pay for franchise support as required by the existing security agreement, and ii) by refusing to require the backup servicer to <u>immediately</u> provide franchise support as provided by the existing servicing agreement (Exhibits B-G).

49.     Husch intentionally ignored Orr's protests for the purpose of hoarding franchise royalties and preventing their use for payment of franchise support (to either the original or backup franchise servicer). The franchise royalties were hoarded for later payment of Husch's legal fees.

50.     Kutak Rock, LLP filed to withdraw its representation of Orr on October 2, 2008 despite this Court's order requiring payment of Kutak Rock, LLP legal fees.  Legal representation of Orr was particularly important because Husch was granted extraordinary powers and that power was unchecked if Orr was not represented.  Orr asked Husch to delay any action regarding franchise support until Kutak

Rock, LLP was replaced. Instead, Husch acted unchecked and halted franchise support within the week. Kutak Rock, LLP has paid $18 million to the Brooke Corporation bankruptcy estates for its pre-bankruptcy transgressions while Husch has thus far avoided all liability.

51.     To avoid scrutiny of its hoarding of franchise royalties for payment of Husch's fees, Husch never responded to Orr regarding his protests (except to threaten Orr for raising those issues) despite the District Court's order that *"The Special Master shall [emphasis added] investigate the claims and other matters raised by the parties to this action...."* (Doc #23, KSD #08-2424).

52.     To avoid scrutiny of its hoarding of franchise royalties for payment of Husch's fees, Husch never communicated with Orr (except to disparage Orr at a board meeting) despite the District Court's order that, *"The Special Master shall [emphasis added] facilitate the exchange of information between the parties and attempt to facilitate a resolution among the parties to this case."* (Doc #23, KSD #08-2424).

53.     To avoid scrutiny of its hoarding of franchise royalties for payment of Husch's fees, Husch caused Brooke Corporation and Brooke Capital to file for bankruptcy on October 28, 2008 and then engineered the appointment of Husch as legal counsel and trustee for the bankruptcy estates.

54.     Husch improperly used the extraordinary powers granted by the District Court to destroy the status quo by hoarding franchise royalties and then using those powers to avoid scrutiny of its actions. As a direct consequence of Husch's misconduct Orr was significantly damaged.

## PARTIES

55.     Plaintiff Robert D. Orr is a citizen of Colorado with a residential address of 2245 S Ellis St, Lakewood, Colorado 80228 and a mailing address of PO Box 140748, Denver, CO 80214.

56.     On information and belief, Defendant Douglas J. Schmidt is a citizen of Kansas and an attorney licensed in Missouri whose principal place of business is 4801 Main Street, Suite 1000, Kansas City, Missouri 64112.

57.     On information and belief, Defendant John J. Cruciani is a citizen of Kansas and an attorney licensed in Kansas whose principal place of business is 4801 Main Street, Suite 1000, Kansas City, Missouri 64112.

58.     On information and belief, Defendant Husch Blackwell, LLP is a law firm whose principal place of business is 4801 Main Street, Suite 1000, Kansas City, Missouri 64112.

## JURISDICTION AND VENUE

59.     The Plaintiff is a citizen of Colorado.

60.     The Defendants are citizens and residents of Kansas or Missouri.

61.     The parties are of diverse citizenship.

62.     The amount or value of the property in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

63.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332 (a).

## BACKGROUND

**Pre-Bankruptcy Background.**

64.     On January 22, 1986 Brooke Corporation was founded by Orr.

65.     On June 24, 2002 BASC was organized in the state of Delaware at the direction of Orr. Brooke Corporation has continuously owned 100% of BASC's membership interests since its organization.

66.     On March 17, 2003 Dean A. Christiansen, of Lord Securities Corporation, was appointed by Orr as BASC independent director. On December 30, 2003 Orr appointed Albert Fioravanti of Lord Securities Corporation as BASC independent director to replace Dean A. Christiansen.

67.     Minutes for March 31, 2003 and October 1, 2003 BASC board meetings demonstrate that BASC was directed to enter into a "*Backup Master Agent Servicing Agreement*" with BNY Asset Solutions LLC.

68.     On April 21, 2003 a BASC officer executed an affidavit affirming that all of the items required by BNY Asset Solutions LLC to back up operations of the franchise support center in Phillipsburg, Kansas had been deposited into a safe deposit box number 685 at the First National Bank of Phillipsburg, Kansas.

69.     Minutes for June 15, 2004, August 27, 2004, December 15, 2005 and December 7, 2007 BASC board meetings demonstrate that BASC was directed to enter into a Backup Master Agent Servicing Agreement with TBSIA, a subsidiary of Textron Business Services.

70.     On or about August 27, 2004, November 1, 2005, August 8, 2007 and June 24, 2008, TBSIA performed extensive tests of back up processes and procedures at the franchise processing center in

Phillipsburg, Kansas in order to perform its duties pursuant to the Backup Master Agent Servicing Agreement with BASC.

71.     On July 1, 2006 TBSIA, a subsidiary of Textron Business Services, executed an updated Backup Master Agent Servicing Agreement with BASC (Exhibit I).

72.     On July 1, 2006 BASC entered into an updated Master Agent Security Agreement requiring : i) that BASC immediately receive monthly franchise royalties to pay franchise servicers for providing franchise support, and ii) that BASC pay TBSIA for backing up the original franchise servicer and providing immediate franchise support in the event of financial calamity (Exhibit H).

73.     On July 18, 2007 Brooke Corporation acquired 62% of Aleritas' common stock for $83,956,000. Aleritas' primary business was making franchise loans and Brooke Corporation relied on the safeguards provided by BASC's Master Agent Security Agreement (Exhibit H) and Backup Master Agent Servicing Agreement (Exhibit I) when making its investment.

74.     On or about August 15, 2007 Brooke Corporation engaged Kutak Rock, LLP to perform an analysis of securitization documents to ensure Brooke Corporation was insulated from financial calamity involving securitizations.  This analysis was largely based on BASC's Master Agent Security Agreement (Exhibit H) and Backup Master Agent Servicing Agreement (Exhibit I).

75.     On August 31, 2007 Brooke Corporation agreed to acquire 64% of Brooke Capital for $25,050,000 and Brooke Corporation relied on the safeguards provided by BASC's Master Agent Security Agreement (Exhibit H) when making its investment.

76.     December 31, 2007 SEC filings disclose that Orr, through his family's private company, had loaned Brooke Corporation $12,382,000 which was renewed on March 31, 2008 as a $12,000,000 unsecured promissory note.  Orr relied on the safeguards provided by BASC's Master Agent Security Agreement (Exhibit H) and Backup Master Agent Servicing Agreement (Exhibit I) when making his loan.

77.     December 31, 2007, March 31, 2008 and June 30, 2008, SEC filings disclose that Brooke intended to sell Aleritas common stock in order to repay its secured lenders.  The price of Aleritas' stock depended on the safeguards provided by BASC's Master Agent Security Agreement (Exhibit H) and Backup Master Agent Servicing Agreement (Exhibit I).

78.     On August 18, 2008 Orr directed that a memo (compiled by Brooke Corporation's general counsel) be delivered to securitization investors advising them of the legal basis for Orr's use of securitized loan payments to pay past due fees to BASC for financial/management assistance provided by BASC to troubled borrowers as required by collateral preservation agreements with securitization investors.

79.     On August 25, 2008 Orr directed that a letter be delivered to securitization investors advising them that proceeds from securitized loan payments would be used to pay past due fees to BASC for financial/management assistance provided by BASC to troubled borrowers as required by collateral preservation agreements with securitization investors.

80.     On August 25, 2008 Orr sent a letter to franchisees providing notification that TBSIA would be taking over franchise support in accordance with the Backup Master Agent Servicing Agreement because securitization investors had not paid past due fees to BASC.  Orr emphasized to franchisees that the status quo would be maintained by stating that, *"Any changes in servicers/processors hired by BASC should have little impact on BASC or its insurance carriers."*

81.     On September 11, 2008 investors in Aleritas' loan securitizations filed suit against Orr for using proceeds from securitized loan payments to pay past due fees to BASC for financial/management assistance provided by BASC to troubled borrowers pursuant to collateral preservation agreements with securitization investors.  The dispute between securitization investors and Orr was eventually settled with a payment to Orr.

82.     On September 15, 2008 Orr proposed the appointment of a special master.  Orr supported his request by asserting, *"In this case, the survival of [Orr's] businesses and of [securitization investors] continued ability to receive payments on its notes secured by adequate collateral is at stake.  The urgent need for resolution of this extremely complex matter requires the attention of a master who can immediately commence review [of] the documents and take actions to safeguard the Securitization structure and processes, **including directing the proper flow of monies pursuant to the Securitization Parties** [emphasis added] [including BASC, Brooke Capital and Textron Business Services]."* and *"This Court should appoint a special master to undertake control of the parties' entire Securitization structure*

*and process, **including but not limited to the analysis and construction of all Securitization Documents to ensure the proper and continued flow of monies to the Securitization Parties** [emphasis added] [including BASC, Brooke Capital and Textron Business Services]. "* (Doc #17, KSD #08-2424).

83.     On September 16, 2008 this Court ordered the appointment of Riederer as special master to *"...ensure the status quo as set out by the existing documents..."* while the dispute between Orr and securitization investors was being resolved.  Husch was retained on this date (Doc #21, KSD #08-2424).

84.     On September 17, 2008 this Court more specifically defined the duties, and associated powers, regarding the special master appointment (Doc #23, KSD #08-2424).

85.     On October 2, 2008 Orr sent whistle blower letters to the boards of directors of the securitization investors asserting that *"...Brooke Capital may be caught in the middle of a scheme by your bank to exaggerate yields of securitization investments by delaying the payment of servicing fees."* (Exhibit C).

86.      On October 2, 2008 Kutak Rock, LLP requested to discontinue their representation of Orr.

87.     On October 2, 2008 Orr protested Husch actions in five separate emails with three memo attachments (dated September 30, 2008, September 23, 2008 and August 18, 2008) explaining the existing securitization documents and protesting Husch's refusal to maintain the status quo as required by the District Court (Exhibit B)

88.     On October 3, 2008 Orr again protested Husch actions in an email with a memo attachment describing Husch's *"ABS [Securitization] Investor Bias"* and including an excerpt from Orr's whistle blower letter regarding the actions of securitization investors (Exhibit C)

89.     On October 4, 2008 Orr again protested Husch's actions in an email with a memo attachment outlining the *"Scope of Consent Order"* and describing Husch's duties and its refusal to perform those duties (Exhibit D).

90.     On October 5, 2008 Orr again protested Husch's action in three emails with one memo attachment warning of imminent collapse unless there was an *"**Immediate** [emphasis added] **Payment of Servicing Fees**"* to ensure continued franchise support as required by the existing securitization documents (Exhibit E).

91.     On October 6, 2008 Orr again protested Husch's actions in an email describing Husch's "*last chance*" to avoid significant damages from the failure of franchise loans by immediately paying servicing fees as required by the existing securitization documents.  Attached to the email was a supporting memo regarding the "*Completion of Special Master Duties*" (Exhibit F).

92.     On October 8, 2008 Orr again protested Husch's actions in a last ditch effort to stop Husch's madness with an email and memo protesting Husch's "*Mismanagement*" (Exhibit G).

93.     On October 9, 2008 franchise support activities ceased.

94.     On October 28, 2008 Husch caused Brooke Corporation and Brooke Capital to file for chapter 11 bankruptcy protection.

**Post-Bankruptcy Background.**

95.     On January 22, 2009, the District Court approved the payment of legal fees to Husch by BASC. Husch's fees were paid from franchise royalties which had been hoarded for this purpose as the result of Husch halting franchise support activities.  Husch did not disclose to the District Court that the hoarding of franchise royalties to pay Husch's fees resulted in the failure of franchise businesses and the failure of franchise loans.  In a surreal conflict of interest, Husch, as representatives of the bankruptcy estates, did not object to the payment of fees to Husch, as representatives of the special master estate.  Furthermore, Husch, as representatives of the bankruptcy estates, did not object to the amount of fees paid to Husch, as representatives of the special master estate, despite the fact that objections to Husch's billings by securitization investors led to reductions in their share of legal fees.

96.     On June 9, 2010 Orr complained in a letter to the US Trustee that the appointment of Riederer as Chapter 7 trustee was improper and intimidating to Orr (Exhibit A)

97.     On June 14, 2010 Orr sent a letter to Riederer regarding his improper appointment as a Chapter 7 trustee (Exhibit A)

98.     On August 11, 2010, Orr filed a lawsuit against Riederer alleging tortious interference on behalf of Orr and alleging gross negligence, breach of fiduciary duties and unjust enrichment on behalf of the shareholders of Brooke Capital (Doc #1-1, KSD #10-1303).  The shareholder derivative allegations languished because Husch refused to allow the Brooke bankruptcy estate to pay the required legal fees

(Doc #4, KSB #6147).  Orr's tortious interference claims were dismissed by this Court due to a lack of malice without any consideration of the merits of Orr's allegations  (Doc #135, KSD #10-1303).

99.      On August 24, 2010 Orr complained in a letter to the US Trustee that the appointment of Riederer as Chapter 7 trustee was improper and intimidating to Orr (Exhibit A).

100.     On October 26, 2010 Riederer and Husch filed an adversary proceeding on behalf of the bankruptcy estates against Orr's wife, son, son-in-law, mother-in-law and brother-in-law (Doc #1, KSB #10-6225).  The adversary proceeding against Orr's family effectively rebutted Orr's lawsuit against Riederer with allegations that false SEC filings by Orr many years before the bankruptcy filings prevented Riederer and Husch from ensuring the status quo during the six weeks that they controlled Brooke Corporation and Brooke Capital immediately prior to the bankruptcy filings.

101.     On May 4, 2011 a civil enforcement action was filed by the SEC against Orr in District Court for filing false SEC reports.  The District Court ruled on April 17, 2012 that it would not assess third tier penalties against Orr because losses were not attributable to false SEC filings and because Orr had made significant sacrifices to assist Aleritas, Brooke Corporation and Brooke Capital during the financial calamity at the request of their respective boards of directors.  (KSD #53, Case #11-2251)

102.     On May 6, 2011 (seven days after refusing Orr's request for funds to prosecute the shareholder derivative suit filed by Orr) Husch filed an adversary proceeding on behalf of the bankruptcy estates seeking to block Orr's lawsuit against Riederer which implicated Husch (Doc #1, KSB #11-6147).

103.     On November 3, 2011 Christopher Redmond, a partner of Husch, was appointed as trustee for the Brooke Corporation bankruptcy estates.

104.     On November 26, 2011 Orr complained in a letter to the U.S. Trustee that the appointment of a Husch partner as Chapter 7 trustee was improper and intimidating to Orr (Exhibit A).

105.     On June 27, 2013 Orr pled guilty to filing a false SEC report in a criminal action derived from the SEC's May 4, 2011 enforcement action.  On October 7, 2013 a presentence investigation report adopted by the District Court stated that false filings to the SEC did not cause damages.  (Doc #34, KSD #12-40121)

106.   On July 22, 2013 Orr complained in a letter to the U.S. Trustee that the causes of action in Orr's shareholder derivative suit implicated Husch and should be investigated by the U.S. Trustee (Exhibit A)

107.   On September 10, 2013 Orr complained in a letter to the U.S. Trustee that the arguments made by Kutak Rock, LLP in response to Husch's malpractice lawsuit implicated Husch and should be investigated by the U.S. Trustee (Exhibit A)

108.   On July 24, 2015 Husch's adversary proceeding against Orr's family on behalf of the bankruptcy estates was settled.  After removing the fear of retaliation by Husch against Orr's family using bankruptcy estate assets, Orr immediately began a process for obtaining cooperation of the Chapter 7 trustee and/or approval of the Bankruptcy Court for the bankruptcy estates to participate in this lawsuit against Husch. Orr was rebuffed by both the chapter 7 trustee and the Bankruptcy Court and therefore shareholder derivative claims are not part of this Complaint.

109.   On December 22, 2015 Kutak Rock, LLP paid $18 million to settle a legal malpractice lawsuit for pre-bankruptcy misconduct involving Brooke Corporation.

**CREDIT ENHANCEMENT**

110.   The Financial Crisis Inquiry Report concludes that the root cause of the 2008 financial crisis was the misuse of loan securitizations, which is the pooling of loans for sale as securities to investors (www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf).

111.   The SEC uses the term "Credit Enhancement" (17 CFR 229.1114) to describe safeguards protecting securitization investors.

**Credit Enhancement Established by Orr to Ensure the Status Quo with Uninterrupted Franchise Support**

112.   Franchise loans are worthless without franchise support.  As such, Credit Enhancement measures to ensure the status quo with uninterrupted franchise support were essential to franchise loan quality.

113.   BASC was organized by Orr as a bankruptcy remote entity for the purpose of establishing Credit Enhancement measures to safeguard investors acquiring securitized or individual franchise loans from franchise lenders (e.g. Aleritas).

114.    At the direction of Orr, BASC entered into security agreements and servicing agreements to accomplish its purpose of establishing Credit Enhancement measures to safeguard investors in franchise loans from an interruption in the franchise support provided to franchise borrowers.

115.    Unlike Orr, the management of some large companies (e.g. AIG Insurance Company) had not established sufficient Credit Enhancement safeguards to prepare for financial calamity and instead received government bailouts to preserve their companies' status quo and sustain their business operations until the crisis abated.  Those large companies receiving government bailouts ultimately prospered.

**Royalties Safeguard was Important Credit Enhancement**

116.    BASC entered into a July 1, 2006 Master Agent Security Agreement with the Bank of New York Mellon  to ensure an immediate and uninterrupted flow of franchise royalties to franchise servicers (Brooke Capital or TBSIA) to pay for franchise support provided to franchise borrowers ("Royalties Safeguard") (Exhibit H).

117.    The Royalties Safeguard ensured the status quo of franchise operations in the event of financial calamity by ensuring that franchise servicers always received franchise royalties so that franchise servicers could always afford to provide franchise support to franchise borrowers.

118.    The Royalties Safeguard protected investors in franchise loans from creditors, adversaries or Husch gaining access to franchise royalties and thereby denying franchise servicers (Brooke Capital or TBSIA) of the money required to pay for uninterrupted franchise support.

119.    Husch damaged Orr by ignoring Orr's written protests to immediately use franchise royalties to pay franchise servicers (Brooke Capital or TBSIA) as required by the Royalties Safeguard.

120.    Husch intentionally breached the July 1, 2006 Master Agent Security Agreement so that Husch could hoard franchise royalties to pay its legal fees.

121.    The July 1, 2006 Master Agent Security Agreement was one of the "*existing documents*" referenced in this Court's September 16, 2008 order and was further defined as one of the "*Securitization Documents*" in this Court's September 17, 2008 order.

**Backup Safeguard was Important Credit Enhancement**

122.    BASC entered into a July 1, 2006 Backup Master Agent Servicing Agreement with TBSIA, a subsidiary of Textron Business Services, to ensure uninterrupted franchise support by immediately (within 72 hours) providing franchise support to franchise borrowers in the event that other franchise servicers could not provide franchise support.  ("Backup Safeguard") (Exhibit I).

123.    The Backup Safeguard ensured the status quo of franchise operations in the event of financial calamity by ensuring that a backup franchise servicer was always on standby to immediately provide franchise support to franchise borrowers.

124.    The Backup Safeguard protected investors in franchise loans from financial difficulties of the original franchise servicer (Brooke Capital) that could prevent Brooke Capital from providing franchise support.

125.    Franchise borrowers were notified by Orr on August 25, 2008 that backup servicer TBSIA would take over franchise support for many of them.

126.    Husch damaged Orr by ignoring Orr's written protests to immediately use franchise royalties to implement the Backup Safeguard and thereby ensure continuation of franchise support to franchise borrowers.

127.    Husch intentionally breached the July 1, 2006 Backup Master Agent Servicing Agreement so that it could hoard franchise royalties to pay its legal fees.

128.    The Backup Safeguard made the financial condition of the original franchise servicer (Brooke Capital) of little consequence to the franchise support provided to franchise borrowers because TBSIA was obligated to take over franchise support in exchange for compensation in the amount of franchise royalties.

129.    The July 1, 2006 Backup Master Agent Servicing Agreement was one of the *"existing documents"* referenced in the District Court's September 16, 2008 order and was further defined as one of the *"Securitization Documents"* in this Court's September 17, 2008 order.

**Assistance Safeguard was Disputed Credit Enhancement**

130.    BASC entered into individual collateral preservation agreements with franchise lenders to provide management and financial assistance to troubled franchise borrowers (on a case by case basis) on behalf of securitization investors ("Assistance Safeguard").

131.    A dispute between Orr and securitization investors over payment of fees for Assistance Safeguard services prompted Orr's proposal to appoint a special master.

132.    Orr complained to the boards of directors of securitization investors that their refusal to pay for Assistance Safeguards: i) improperly exaggerated their investment yields, and ii) jeopardized the financial condition of the original franchise servicer (Brooke Capital).

133.    Husch was retained to assist in resolution of the dispute between Orr and securitization investors regarding the Assistance Safeguard in accordance with the District Court's September 16, 2008 and September 17, 2008 orders.

134.    Husch was required to maintain the status quo by implementing the Backup Safeguard and Royalties Safeguard while assisting in resolution of the dispute regarding the Assistance Safeguard in accordance with the District Court's September 16, 2008 and September 17, 2008 orders.

## ORR'S CONSENT TO COURT'S SPECIAL MASTER APPOINTMENT AND HUSCH EMPLOYMENT

### Special Master Duties Defined Pursuant to Rule 53

135.    Orr proposed appointment of a special master for the purpose of ensuring the status quo while assisting in resolution of Orr's dispute with securitization investors (Doc #17,18, KSD #08-2424).

136.    Rule 53 requires that, *"...a court may appoint a master only to:  (A) perform duties consented to by the parties* (F.R.C.P. 53 (a)(I)(A)).

137.    With the consent of Orr, the District Court ordered that, *"Pursuant to Federal Rule of Civil Procedure 53 (a)(l)(A) and this Court's inherent authority, the Court hereby appoints Albert A. Riederer as Special Master (the "Special Master") to proceed with all reasonable diligence to carry out the duties specified herein."* (Doc #23, KSD #08-2424).

138.    With the consent of Orr, the District Court ordered the special master to perform the following duties, *"The special master's role will be **to ensure the status quo as set out by the existing documents***

*[emphasis added], facilitate exchange of information, guide discovery process and aide the parties in resolution of their disputes..."* (Doc #21, KSD #08-2424).

139.    Orr would not have consented to the appointment of a special master without the District Court's order defining the scope of duties to first include ensuring the status quo as set out by the existing documents.

**Powers Granted for Performance of Special Master Duties Pursuant to Rule 53**

140.    With the consent of Orr, the District Court granted extraordinary powers to the special master to assure the performance of his first assigned duty to *"ensure the status quo"*. As summarized by the District Court, *"...as articulated by the Court in its initial order on September 16, those powers were to 'ensure the status quo' as well as to fully empower the Special Master to discharge his discovery related duties"* (Doc #87, KSD #08-2424).

141.    With the consent of Orr, this Court granted extraordinary powers to Riederer and Husch by establishing a special master estate (including Brooke Corporation and Brooke Capital) to be administered by Riederer and Husch (Doc #23, KSD #08-2424).

142.    Orr would not have consented to the grant of extraordinary powers to Riederer and Husch without the District Court's order limiting the use of those powers to ensuring the status quo as set out by the existing documents.

143.    Despite Orr's repeated written protests, Riederer and Husch used their extraordinary powers for the improper purpose of silencing Orr so Husch could hoard franchise royalties for the payment of Husch's fees. In an October 2, 2008 email, Orr expressed his frustration by stating, *"This is an outrage. I have been an enthusiastic supporter of this process because the special master had authority to maintain status quo while addressing servicing [Assistance Safeguard] fee collections. Now BCP [Brooke Capital] is no longer."* (Exhibit B),

**Special Master and Husch are One and the Same**

144.    With the consent of Orr, this Court authorized the employment of Husch (Doc #23, KSD #08-2424).

145.     Husch has argued on behalf of the Brooke Corporation bankruptcy estates that, *"Courts in Kansas hold that an attorney or law firm and its client are really and substantially in interest the same..."* (Doc #5599, KSB #08-22786).  As such, Husch has effectively acknowledged that it is equally culpable with the special master for pre-bankruptcy misconduct.

146.     Husch has argued on behalf of the Brooke Corporation bankruptcy estates that the Brooke Corporation and Brooke Capital special master estate was fused with the Brooke Corporation and Brooke Capital bankruptcy estates.  As such Husch Blackwell has effectively acknowledged that their representation and control of Brooke Corporation and Brooke Capital was continuous from September 16, 2008 until this date.  (Doc #4, KSB #11-6147).

147.     Husch's pre-bankruptcy misconduct includes thumbing its nose at the District Court's orders to ensure the status quo (Doc #21, KSD #08-2424) (Doc #87, KSD #08-2424) by breaching existing *"Security Agreements"* and by refusing to implement existing *"Servicing Agreements"* (Doc #23, KSD #08-2424).

148.     Husch's pre-bankruptcy misconduct includes the stifling of Orr's repeated written protests (Exhibits B-G) despite the facts that: i) Husch caused Orr to be without legal counsel, and ii) this Court ordered Husch to work with Orr (Doc #23, KSD #08-2424).

### FIRST DUTY OF SPECIAL MASTER AND HUSCH WAS TO ENSURE THE STATUS QUO AS SET OUT BY THE EXISTING DOCUMENTS

**Special Master was Appointed to perform the Duty of Ensuring the Status Quo during Resolution of the Assistance Safeguards Dispute using the Backup Safeguard and Royalties Safeguard**

149.     With the consent of Orr, the very first duty assigned to the special master was the duty of ensuring the status quo *"...as set out by the existing documents..."* (Doc #21, Case #08-2424).

150.     With the consent of Orr, the District Court reiterated the special master's first duty by ordering that, *"The Special Master will act on behalf of the Special Master Entities and their subsidiaries to implement the terms of the Securitization Documents [emphasis added]..."* (Doc #23, KSD #08-2424).

151.     With the consent of Orr, the District Court further defined the documents relative to performing the special master's first duty, *"The term 'Securitization Documents' includes all documents, including,*

*without limitation, all Credit Agreements, Indentures, **Security Agreements** [emphasis added] Pledge Agreements, **Servicing Agreements** [emphasis added], and all amendments thereto and restatements thereof, setting forth the terms of the Securitizations"* (Doc #23, KSD #08-2424).

152.    With the consent of Orr, the District Court emphasized the importance of the Royalties Safeguard, as implemented by security agreement (Exhibit H), by ordering that, *"The Consent Order shall not modify, impair, or eliminate any rights granted to any party, or any agent or trustee for any such party, under the Securitization Documents, **including, without limitation, any grant of a security interest** [emphasis added]"* (Doc #23, KSD #08-2424).

153.    The Master Agent Security Agreement (Exhibit H) implementing the Royalties Safeguard was one of the two most important Securitization Documents because it protected monthly franchise royalties from being used for any purpose other than immediately paying franchise servicers (Brooke Capital or TBSIA) for providing uninterrupted franchise support to franchise borrowers.

154.    With the consent of Orr, the District Court emphasized the importance of the Backup Safeguard, as implemented by a backup servicing agreement (Exhibit I), by granting the special master the authority for, *"...the operations conducted by the Master Agent Servicer [Brooke Capital]to be transferred to TBSIA[a subsidiary of Textron Business Systems]..."* (Doc #23, Case #08-2424).

155.    The Backup Master Agent Servicing Agreement (Exhibit I) implementing the Backup Safeguard was the second of the two most important Securitization Documents because it ensured that a backup servicer (TBSIA) would provide immediate uninterrupted franchise support in the event that the original servicer (Brooke Capital) experienced financial difficulties.

**Special Master and Husch Hoarded Franchise Royalties by Refusing to Implement the Backup Safeguard and Royalties Safeguard**

156.    Husch improperly used the extraordinary powers granted by the District Court for the destructive purpose of halting the franchise support provided to franchise borrowers by refusing to implement the Backup Safeguard and Royalties Safeguard.

157.    Husch improperly used the extraordinary powers granted by the District Court to prevent the immediate payment of franchise royalties to franchise servicers (Brooke Capital and TBSIA) for

providing franchise support so that franchise royalties could instead be hoarded for payment of Husch's legal fees.

158.    Husch improperly used the powers granted by the District Court to prevent a backup servicer (TBSIA) from replacing the original servicer (Brooke Capital) so that franchise royalties could instead be hoarded for payment of Husch's legal fees.

**SECONDARY DUTIES OF SPECIAL MASTER BECAME MEANINGLESS WHEN THE SPECIAL MASTER AND HUSCH REFUSED TO PERFORM THE FIRST DUTY OF ENSURING STATUS QUO**

159.    With the consent of Orr, the District Court ordered the special master to perform several important duties after first ensuring the status quo as set out by the existing documents.  However, the refusal to perform the first duty of implementing the Backup Safeguard and Royalties Safeguard caused franchise support to cease which in turn destroyed franchise loan quality and therefore made meaningless the other secondary duties assigned to the special master.

**Duty to Assist in Resolving Dispute Regarding Assistance Safeguards**

160.    With the consent of Orr, this Court ordered that, *"The Special Master shall investigate the claims and other matters raised by the parties to this action...The Special Master shall (a) work with the Special Master Entities to detail the collateral protection [Assistance Safeguards] fees and related costs and expenses that the Special Master Entities claim; (b) facilitate resolution of such claims with the Plaintiff and other parties against which such claims are made in accordance with the governing agreements; and (c) report to the Court on any such [Assistance Safeguards] claims not resolved between the parties. The Special Master shall facilitate the exchange of information between the parties and attempt to facilitate a resolution [of the Assistance Safeguards fee dispute] among the parties to this case."*(Doc #23, KSD #08-2424).

161.    Although rendered meaningless by their refusal to ensure the status quo, Riederer and Husch did nothing to investigate or resolve the Assistance Safeguards dispute and had no communications with Orr regarding investigation or dispute resolution.

**Duty to Assist in Preparation of SEC Reports**

25

162.     With the consent of Orr, the District Court ordered that, *"The Special Master will work with the chief executive officer and the chief financial officer of each Special Master Entities [Brooke Corporation and Brooke Capital] in the preparation of financial information required by applicable securities law."* (Doc #23, KSD #08-2424).

163.     Although repudiated by District Court rulings, Husch has argued that reporting of false financial information to the SEC caused losses by Brooke Corporation and Brooke Capital (Doc #4, KSB #11-6147).  In yet another surreal circumstance, Husch argues that financial information reported to the SEC was false despite the fact that Husch was required to assist in the preparation of financial information for reporting to the SEC.

**Duty to Promote Corporate Governance**

164.     With the consent of Orr, the District Court ordered that, *"Brooke Corp. Brooke Capital and Aleritas will exercise their best efforts at all times to maintain on their respective boards a majority of independent directors, as independence is defined under rules of the exchanges on which each company's securities are listed or under SEC rules, as applicable.....no action of the Board of Directors shall be approved without the affirmative action of a majority of the full number of members of the Board of Directors."* (Doc #23, KSD #08-2424).

165.     As set forth in an October 4, 2008 memo, Orr protested that the District Court's order *"....does not permit you [Husch] to terminate [Mike] Hess as CEO and thereby usurp the board's authority to hire a chief executive office of their choosing"* and *"...does not permit you [Riederer] to appoint yourself as CEO and again usurp the board's authority to hire a chief executive officer of their choosing."* (Exhibit D)

166.     Despite the fact that Orr and Mike Hess were Brooke Corporation and Brooke Capital directors, Riederer and Husch responded in an October 5, 2008 email that, *"You [Orr] are no longer a part of the governance of this enterprise, and neither is Mike Hess [CEO and director]....you [Orr] are hereby ordered to stop your meddling..."*  Orr responded in an October 5, 2008 email that, *"...you [Mike] remain CEO of Brooke Capital and are obligated to protect the company's interests.  However, as we discussed*

*yesterday, we must remain entirely cooperative with special master and, when Brooke Capital is again*
*represented by counsel, will go to the court...."* (Exhibit E)

167.    Despite the District Court's order to the contrary, Husch improperly used its extraordinary powers
to circumvent and subvert corporate governance that was required by the Sarbanes-Oxley Act of 2002 as
implemented by NASDAQ and American Stock Exchange.

**Duty to Not Select Brooke Capital CEO**

168.    With the consent of Orr, the District Court ordered that, *"An executive committee of the board of*
*directors of Brooke Capital consisting of its independent members will, beginning on the date hereof,*
*launch a search for a permanent CEO, who will be selected and appointed by the board of directors on or*
*prior to November 15, 2008."* (Doc #23, KSD #08-2424).

169.    As set forth in an October 2, 2008 memo, Orr asserted that Riederer and Husch improperly used
their extraordinary powers to fire the CEO selected by the Brooke Capital board, *"Apparently without*
*consultation with the board of directors, employees or insurance carriers, you [Husch] fired the*
*individual most capable of maintaining relationships through a difficult time....The order [of September*
*17, 2008] specifically notes that the Brooke Capital board of directors has the authority to appoint the*
*CEO and the special master is not part of the board of directors. Never the less, Mike [Hess] was fired*
*[by Husch] without cause and you [Riederer] assumed the position of CEO. As CEO you have*
*responsibility to Brooke Capital shareholders and creditors but instead your allegiance appears to be to*
*the ABS investors."* (Exhibit B)

**Duty to Report and Disclose**

170.    The District Court required disclosure of operational issues and matters raised by Orr (Doc #23,
KSD #08-2424). Despite this requirement, there was no report or disclosure by Husch to the District
Court of Orr's protests against Husch's hoarding of franchise royalties to pay for franchise support. Not
only was this disclosure failure contrary to the District Court's order, it was also contrary to the Model
Rules of Professional Conduct.

171.    Full and accurate disclosure of Orr's protests by Husch to the District Court was especially important because Husch caused Orr to be unrepresented by counsel during the critical time that Husch controlled the special master estate.

### HUSCH DENIED LEGAL REPRESENTATION TO ORR DESPITE ORDERS TO THE CONTRARY AND IGNORED ORR'S STATED LEGAL POSITION

**Husch Denied Legal Representation to Orr**

172.    With the consent of Orr, the District Court ordered that, *"Kutak Rock LLP ("Kutak"), counsel for Defendants in this instant litigation, shall issue its invoices for fees and expenses incurred on behalf of any Defendants to the Special Master by electronic transmission or hard copy delivery on a daily basis. Within five business days of receipt of each such daily invoice, the Special Master shall review the invoice and...direct prompt payment thereof."* (Doc #23, KSD #08-2424).

173.    On October 2, 2008, Kutak Rock, LLP moved for the District Court's approval to withdraw as Orr's legal counsel.  (Doc #27, KSD #08-2424).

174.    In an October 2, 2008 memo supporting its motion to withdraw as legal counsel, Kutak Rock, LLP asserted that, *"Notwithstanding Consent Order ¶ 22, the Special Master has declined to direct payment of Kutak Rock invoices in this action now currently totaling $60,000.00....Such nonpayment will result in an unreasonable financial burden upon Kutak Rock if it is forced to continue as counsel for Joint Defendants in this action."*  (Doc #28, KSD #08-2424).

175.    In an October 3, 2008 memo, Orr stated that, *"Kutak Rock has withdrawn their representation of Brooke Capital, which is a huge blow to the company. They withdrew because their fees were not paid and you did not use your authority to get those fees paid."* (Exhibit C).

176.    In an October 5, 2008 email Orr requested that Husch, *"...not make any decisions that have long-term or strategic consequences, such as a "major restructuring", until Brooke Capital is represented by counsel."* (Exhibit E)

177.    In an October 9, 2008 letter to the District Court, Orr stated that, *"Kutak Rock has discontinued their representation of me.  I have therefore contacted Brooke's insurance carrier for guidance on*

selection of an attorney to replace Kutak Rock and hope to have an attorney retained soon so that I am represented at the Friday [October 10, 2008] hearing."

178.    As a result of the use of the extraordinary powers granted to Husch to deny legal representation to Orr, Husch asserted absolute control over the special master estate and thereby neutered Orr.

**Husch Ignored Orr's Legal Position Regarding Securitization Documents**

179.    In an October 2, 2008 email, Orr stated that, *"I [Orr] am not the one that should be making the company's legal arguments, but I care."* (Exhibit B).  Because legal representation was denied, Orr was the only alternative willing to make legal arguments as the result of Orr's individual consent to the special master's duties and powers.

180.    In an October 2, 2008 email, Orr stated his legal position that *"Albert [Riederer]and Doug [Schmidt]: I [Orr] would to also point out that Level I fees [fees for Royalties Safeguard] (like Level III fees) [fees for Assistance Safeguard] must also be paid prior to any distributions to ABS [securitization] investors.  If Level III fees [fees for Assistance Safeguard] remain in dispute, then Level I fees [fees for Royalties Safeguard] should be paid!  As set forth in the securitization documents, servicers [Brooke Capital and TBSIA] are to receive their money first so that train wrecks like this do not happen.  I again vigorously assert that ALL servicing fees should FIRST be used to pay the servicer [Brooke Capital or TBSIA] as provided in the [existing] documents."* (Exhibit B).

181.    In October 2, 2008 emails, Orr stated that, *"This is absolutely and unquestionably a legal wrong.....Until I get kicked out by the special master, I will do what I can to advocate Brooke's legal position and get employees and franchisees paid."* (Exhibit B).

## ALLEGATIONS CENTER ON ORR'S DESPERATE PROTESTS MADE FROM OCTOBER 2, 2008 UNTIL OCTOBER 9, 2008

182.    During the six days prior to the October 9, 2008 cessation of franchise support, Orr delivered seventeen separate emails and memos protesting the misconduct of Riederer and Husch (Exhibits B-G) ("Orr's Protests").  Orr's Protests are central to this Complaint.

183.    Orr's Protests provides a chilling description of desperation as Orr pled with Husch to comply with District Court orders requiring Husch to maintain the status quo by immediately using franchise

royalties to continue uninterrupted franchise support in accordance with existing securitization documents.

**October 2, 2008 Withdrawal of Representation by Kutak Rock, LLP**

184.    Orr's first Protest was made on October 2, 2008 which is the date that Kutak Rock, LLP requested to withdraw representation of Orr.

**October 2, 2008 Protests**

185.    Orr's Protests of October 2, 2008 includes five separate emails with three memo attachments explaining the existing securitization documents and protesting Husch's failure to maintain the status quo as required by the District Court (Exhibit B).  Husch did not respond to Orr's Protests (except to threaten Orr for raising issues).

186.    Several critical issues were addressed in Orr's Protests of October 2, 2008, including description of Orr's legal position that, *"This is absolutely and unquestionably a legal wrong...."* and *"As set forth in the securitization documents, servicers are to receive their money first so that train wrecks like this do not happen.  I again vigorously assert that ALL servicing fees should FIRST be used to pay the servicer as provided in the documents."*(Exhibit B).

**October 3, 2008 Protests**

187.    Orr's Protests of October 3, 2008 includes one email with one memo attachment describing Husch's *"ABS [Securitization] Investor Bias"* which in turn includes an excerpt from Orr's whistle blower letter regarding the improper actions of securitization investors (Exhibit C).  Husch did not respond to Orr's Protests (except to threaten Orr for raising issues).

188.    Several critical issues were addressed in Orr's Protests of October 3, 2008, including Orr again addressing the special master's duties, *"The Judge clearly indicated that the intent of the special master arrangement was to maintain the status quo while the servicing [Assistance Safeguard] fee dispute was resolved."* and Husch's failure to do so *"....has thrown the business into turmoil and meltdown."* (Exhibit C)

**October 4, 2008 Protests**

189.    Orr's Protests of October 4, 2008 includes one email with one memo attachment outlining the *"Scope of Consent Order"* which in turn describes Husch's duties and their failure to perform those duties (<u>Exhibit D</u>).  Husch did not respond to Orr's Protests (except to threaten Orr for raising issues).

190.    Several critical issues were addressed in Orr's Protests of October 4, 2008, including discussion of conflicts of interests between special master duties and corporate governance duties.  For example, Orr's Protests asserted that officers and directors, *"...must vigorously protect the interests of their constituents even if that means disagreeing with the special master"* (Exhibit D).

**October 5, 2008 Protests**

191.    Orr's Protests of October 5, 2008 includes three emails with one memo attachment warning of imminent collapse unless there was an *"**Immediate** [emphasis added] Payment of Servicing Fees"* to ensure immediate use of franchise royalties to pay for uninterrupted franchise support as required by the existing securitization documents (Exhibit E).  Husch did not respond to Orr's Protests (except to threaten Orr for raising issues).

192.    Several critical issues were addressed in Orr's Protests of October 5, 2008, including an unambiguous warning that, *"If you do not **immediately** [emphasis added] pay the Level I [Royalty Safeguard] and Level III [Assistance Safeguard] fees to which Brooke Capital is entitled, by withholding commissions from ABS [securitization] investors as provided in the securitization documents, then Brooke Capital will cease to exist. <u>Securitization documents always provide that servicers are paid first!</u>"* (Exhibit E)

**October 6, 2008 Protests**

193.    Orr's Protests of October 6, 2008 includes one email describing Husch's *"last chance"* to avoid Brooke Corporation's collapse from the failure of franchise loans by immediately paying servicing fees as required by the existing securitization documents.  Attached to the email was a memo regarding the *"Completion of Special Master Duties"* which discussed the importance of immediate completion of special master duties (<u>Exhibit F</u>).  Husch did not respond to Orr's Protests (except to threaten Orr for raising issues).

194.    Several critical issues were address in Orr's Protests of October 6, 2008, including an assertion that, *"The overall mandate of the special master is to implement the terms of the Securitization Documents"* and an assertion that, until franchise support is transferred to TBSIA, *"the Master Agent Servicing Agreement requires that Brooke Capital receive a share of commissions [Royalties Safeguard fees] that has been specifically calculated (in cooperation with S&P and Textron) to approximate the amount of expenses..."* required to provide franchise support (Exhibit F).

**October 8, 2008 Protests**

195.    Orr's Protests of October 8, 2008 includes a last ditch effort to stop Husch's madness with an email and memo protesting Husch's *"Mismanagement"* (Exhibit G).  Husch did not respond to Orr's Protests (except to threaten Orr for raising issues).

196.    Several critical issues were address in Orr's October 8, 2008 Protests, but perhaps most tellingly was Orr's exasperated statement that, *"Quite frankly, I would like to immediately resign from the Brooke Capital board of directors, but I feel a responsibility to creditors, franchisees and employees and will therefore temporarily continue as a director and advocate for these constituencies."* (Exhibit G).

**October 9, 2008 Cessation of Franchise Support**

197.    On October 9, 2008 franchise support ceased because Husch ignored Orr's Protests and refused to implement securitization documents requiring that franchise royalties be immediately used to provide uninterrupted franchise support to franchise borrowers (Exhibits B-G).  Franchise loans failed because Husch halted franchise support resulting in damages to Orr.

### HUSCH INTENTIONALLY IGNORED ORR'S PROTESTS TO AVOID SCRUTINY OF ITS IMPROPER AND UNJUST ACTIONS

**Husch Ignored Orr's Protests**

198.    Although Orr was the primary defendant consenter to the designation of special master duties (and the granting of extraordinary power to accomplish those duties), Husch did not respond or communicate with Orr in any manner with regards to Orr's specific, documented and well-reasoned protests.

199.     Although the District Court required that Husch *"...shall facilitate the exchange of information..."* and *"....shall investigate the claims and other matters raised by the parties..."* (Doc #23, KSD #08-2424), Husch did not respond or communicate with Orr in any manner with regards to Orr's specific, documented and well-reasoned protests.

**Husch Ignored Orr's Protests so Franchise Royalties Could be Hoarded by the Special Master Estate and then used to Pay Husch's Fees**

200.     The hoarding, or withholding, of franchise royalties caused irreversible damages by halting franchise support.  As demonstrated by the requirement in the Backup Master Agent Servicing Agreement that TBSIA provide backup franchise support within 72 hours, the cessation of franchise support for any more than 72 hours would cause irreversible damages.

201.     Analysis of Orr's Protests demonstrate that Orr was initially unaware of Husch improper motives for ignoring Orr's Protests and refusing to immediately use franchise royalties to pay for uninterrupted franchise support.  Orr's Protests demonstrate that Orr initially believed that Husch was hoarding franchise royalties for improper payment to securitization investors.  However, it eventually became clear that Husch was hoarding franchise royalties for themselves, so that: i) franchise royalties could be improperly paid to Husch from the special master estate, and ii) bankruptcies would result from the hoarding of franchise royalties and Husch could generate unconscionable amount of legal fees from the bankruptcy estates.

202.     Analysis of Orr's Protests also demonstrate that the only source of funds for payment of Husch's fees were franchise royalties, *"...Brooke Capital's only significant source of revenues is the franchise royalties/fees generated by the Phillipsburg campus for providing document management and cash management to existing franchisees as required by franchise agreements...."*

203.     Husch was paid approximately $40,000 for each business day they controlled the special master estate.  It would have only cost $25,000 per business day for either Brooke Capital or TBSIA to provide franchise support through the franchise processing center.

204.     Husch did not disclose Orr's Protests to the District Court and thereby avoided District Court scrutiny of Husch's misconduct.  As such, Husch did not provide the District Court with the information required for the District Court to consider the source or fairness of Husch fees.

**Husch Ignored Orr's Protests in order to cause Bankruptcy by Hoarding Franchise Royalties and thereby Generate Unconscionable Amount of Fees from the Bankruptcy Estates**

205.     Using the extraordinary powers granted to Husch (with Orr's consent), Husch halted franchise support so Husch could hoard franchise royalties for payment of Husch's fees.  Franchise borrowers cannot repay franchise loans without franchise support.

206.     Using the extraordinary powers granted to Husch (with Orr's consent), Husch prepared the bankruptcy schedules and caused the bankruptcy filings of Brooke Corporation and Brooke Capital. Causing bankruptcy is the exact opposite of performing the special master duty to ensure the status quo.

207.     Using the extraordinary powers granted to Husch (with Orr's consent), Husch engineered its appointment as legal counsel for the Brooke Corporation bankruptcy estates.  As a result, Husch has collected nearly $20 million from the bankruptcy estates.

**Husch Ignored Orr's Protests so that Special Master Powers could be used to Engineer Husch's Appointment as Legal Counsel for the Bankruptcy Estates and thereby Protect Husch from Liability for Hoarding Franchise Royalties to Pay Husch's Fees**

208.     Using the extraordinary powers granted to Husch (with Orr's consent), Husch engineered its appointment as legal counsel for the Brooke Corporation bankruptcy estates.  As a result, the bankruptcy estates have been used by Husch to prevent litigation against Husch for ignoring Orr's Protests.

209.     Using its authority as legal counsel for the bankruptcy estates, Husch blocked shareholder derivative litigation implicating Husch by asserting that the special master estate and the bankruptcy estates are fused together (Doc #4, KSB #11-6147).  Based in part on the justification that the special master estate is fused with the bankruptcy estates, Husch has used the bankruptcy estates to prevent litigation against Husch on behalf of the special master estate.

210.   Using its authority as legal counsel for the bankruptcy estates, Husch blocked any opposition to their request to the District Court to use hoarded franchise royalties to pay fees for their involvement with the special master estate.

211.   Using its authority as legal counsel for the bankruptcy estates, Husch used the bankruptcy estates "piggy bank" to purchase its exoneration from liability for ignoring Orr's Protests against the hoarding of franchise royalties to pay their fees.

212.   Using its authority as legal counsel for the bankruptcy estates, Husch has attempted to silence Orr.  These attempts include misusing the litigation discretion of the bankruptcy trustee to: i) intimidate Orr with litigation against his family based on a cause of action which exonerated Husch from Orr's allegations, and ii) financially starving Orr by objecting to a bankruptcy claim for payment of a promissory note for which Husch's hoarding of fees caused non-payment in the first place.

**Husch Lacks Credibility in this Matter**

213.   The District Court noted the sacrifices of Orr when refusing to assess civil money penalties of the kind reserved for persons causing losses, *"......the court has given weight to the defendants' efforts at stepping into the gap and risking their own money and time to address the unfolding and growing financial crises..... a significant mitigating factor is that in response to the financial problems and liquidity crises, the defendants assumed responsibilities for the struggling corporations [and] committed more of their personal financial resources to the different ventures ...The defendants certainly made financial sacrifices, personally and professionally, to assist Aleritas and Brooke Capital in the middle of these crises..."* (Pages #18-26, Doc #53, Case #11-2251).

214.   In contrast to Orr's financial sacrifices, Husch enriched themselves by hoarding monthly franchise royalties to pay their legal fees instead of paying for franchise support.  As a result, Husch halted franchise support and thereby damaged Orr and the lives of thousands.

215.   In contrast to Orr's financial sacrifices, Husch further enriched themselves by collecting an unconscionable amount of legal fees from the Brooke Corporation bankruptcy estates after it had caused Brooke Corporation's bankruptcy filing.  As a result, Husch has enriched themselves to the tune of nearly $20 million.

## HUSCH IMPROPER USE OF BANKRUPTCY ESTATES TO IMPACT, DELAY AND IMPEDE THE FILING OF THIS COMPLAINT

**Orr has Appealed Bankruptcy Court Rulings which Improperly Allowed Husch to use Bankruptcy Estates to Impact, Delay and Impede this Complaint**

216.    The Chapter 7 Trustee's Handbook compiled by the Department of Justice (www.justice.gov/ust) requires disqualification of a trustee or his law firm if a "*potential cause of action*" for litigation exists.

217.    Husch should have been disqualified from serving the bankruptcy estates because a "*potential cause of action*" for litigation exists against Husch as plainly demonstrated by this Complaint.

218.    Since freed of intimidation by resolution of the adversary proceeding against Orr's family, Orr has repeatedly requested the Bankruptcy Court to consider Orr's allegations and to disqualify Husch from serving the bankruptcy estates because a "*potential cause of action*" for litigation exists against Husch. However, the Bankruptcy Court has steadfastly refused to: i) consider Orr's allegations, ii) permit discovery regarding Orr's allegations, or iii) to retain special counsel to review Orr's allegations.

219.    The following appeals have been filed as a result of the Bankruptcy Court's refusal to consider whether the allegations in this Complaint represent "*potential causes of action*":

    i)     Orr has appealed the Bankruptcy Court's decision to sustain Husch's objection to Orr's Claim #924-1 because these "*potential causes of action*" disqualify Husch from objecting to a claim, the proceeds of which have been pledged by Orr for prosecuting this Complaint against Husch (KSD #16-2273, KSD #16-2274);

    ii)     Orr has appealed the Bankruptcy Court's decision to deny Orr's request to retain special counsel to review these "*potential causes of action*" and, if deemed warranted, participate in prosecuting shareholder derivative allegations against Husch (KSD #16-2600);

    iii)     Orr has appealed the Bankruptcy Court's decision to deny Orr's request for reimbursement of legal fees by Husch to the bankruptcy estates as a remedy for their conflicted service of the bankruptcy estates (KSD #16-2599).

**Improper Appointment of Husch as Legal Counsel of the Bankruptcy Estates in order to Improperly Use Bankruptcy Estates to Impact this Complaint**

220.    In order to secure their appointment as legal counsel of the bankruptcy estates and thereby enrich themselves while impeding the filing of this Complaint:

      i)      Husch perjured themselves by affirming in declarations filed with the Bankruptcy Court that they did not have *"...any interest adverse to the estates"* when in fact Orr's Protests clearly demonstrate that Orr (and other board members) had alleged that Husch was responsible for halting franchise support resulting in the failure of franchise lenders (Aleritas), franchise servicers (Brooke Capital) and their shareholders (Brooke Corporation);

      ii)     Husch omitted disclosure of Orr's Protest to the Bankruptcy Court, despite the fact that Orr's Protests documented an acrimonious and disastrous dispute between Husch and board members during the six weeks that Husch controlled Brooke Corporation and Brooke Capital immediately prior to their bankruptcy filings;

      iii)    Husch omitted disclosure of an asset for malpractice against Husch during their preparation of Brooke Corporation and Brooke Capital bankruptcy schedules.  The significance of this omission is magnified by the payment of $18 million to the bankruptcy estates by Kutak Rock, LLP for its malpractice, despite the fact that the malpractice of Kutak Rock, LLP was much less damaging than the malpractice of Husch.

221.    In a legal environment where the deepest pockets usually win, Husch controls the bankruptcy estate's $35 million in recoveries.  In yet another surreal circumstance, most of the bankruptcy estate funds came from a malpractice settlement with Kutak Rock, LLP (for malpractice less damaging than Husch's misconduct) and most of the bankruptcy estate funds have been paid to Husch (for prosecuting adversary proceedings based on causes of action exonerating Husch).

222.    As the primary consenting defendant, and as the only consenting defendant not controlled by Husch, Orr is the only voice of opposition to Husch's misconduct during the six weeks that Husch controlled Brooke Corporation and Brooke Capital.  As such, Husch has improperly used the bankruptcy estates to delay and impede Orr's Complaint.

**Use of Bankruptcy Estate Assets to Purchase Expert Report Exonerating Husch from Orr's Complaint Allegations**

223.    Husch has preemptively rebutted the allegations in this Complaint by using nearly 10% of the bankruptcy estates assets ($3 million) to purchase a report from Veris Consulting, LLC ("Veris") which exonerates Husch from causing the losses which resulted in the bankruptcies of Brooke Corporation and Brooke Capital.  Veris' report was based on the opinion that losses were caused by the filing of SEC reports which recorded franchise royalty fees as initial franchise fees many years prior to Husch's control of Brooke Corporation and Brooke Capital.

224.    Veris' expert opinion that false financial information in SEC reports caused the losses resulting in bankruptcy filings has been directly and unequivocally repudiated by District Court findings and SEC pleadings that false SEC reports did not cause any losses.

225.    Veris preemptively rebutted the allegations against Husch in this Complaint with:

  i)  Veris' discredited opinion that SEC filings were false because financial information regarding the sufficiency of franchise royalties was inaccurate.  This provided Husch with an expert's opinion substantiating their previously stated defense to this Complaint's allegations that the hoarding of franchise royalties by Husch was of no consequence because franchise royalties were not enough to pay for franchise support.

  ii)  Veris' discredited opinion that Brooke Corporation and Brooke Capital incurred losses many years before Husch's involvement) because financial information reported to the SEC regarding the sufficiency of franchise royalties was inaccurate.  This provided Husch with an expert's opinion substantiating their previously stated defense to this Complaint's allegations that Brooke Corporation and Brooke Capital incurred losses long before Husch controlled the companies during the six weeks prior to their bankruptcy filings.

  iii)  Veris' omission of the contractual requirement for the backup servicer (TBSIA) to immediately take over franchise support if the original servicer (Brooke Capital) is unable to provide franchise support.  The backup servicer (TBSIA) was obligated to take

over franchise support in exchange for compensation equal to the amount of franchise

royalties. Husch has improperly used the Veris report to cover up the fact that the

amounts of franchise royalty fees were not relevant to Brooke Corporation's financial

condition because TBSIA was required to provide franchise support without regard to the

adequacy of franchise royalty fees.

**Use of Bankruptcy Estate Assets to File an Adversary Proceeding against Orr's Family to Delay the Filing of this Complaint**

226.     In apparent response to Orr's August 11, 2010 filing of a lawsuit implicating Husch (Doc #1-1,

KSD #10-1303), Husch used the bankruptcy estates to file an adversary proceeding on October 26, 2010

against Orr's wife, son, son-in-law, mother-in-law and brother-in-law (Doc #1, KSB #10-6225).

227.     The October 26, 2010 adversary proceeding filed against Orr's family was based on a Veris

report which improperly exonerated Husch from the allegations made in this Complaint.

228.     The October 26, 2010 adversary proceeding filed against Orr's family intimidated Orr into

delaying the filing of this Complaint until the adversary proceeding against Orr's family was finally

resolved.

**Use of Bankruptcy Estate Assets to File an Adversary Proceeding Against Orr to Impede Prosecution of Previous Shareholder Derivative Litigation Implicating Husch**

229.     In direct response to the filing of Orr's August 11, 2010 lawsuit (Doc #1-1, KSD #10-1303),

Husch used the bankruptcy estates to file a May 6, 2011 adversary proceeding seeking an injunction to

block Orr's lawsuit (which included shareholder derivative allegations for which the District Court had

found Orr to be a suitable shareholder representative).

230.     In yet another surreal circumstance, Husch based its request for an injunction to block Orr's

August 11, 2010 lawsuit on its stated concern that the District Court could find Husch responsible for

Brooke Corporation and Brooke Capital's bankruptcy which was "*inconsistent*" with the Veris report that

false SEC reporting caused the bankruptcies and that finding Husch responsible would cause a bankruptcy

administration mess (Doc #4, KSB #11-6147).

231.     Excerpts from Husch's motion for an injunction blocking Orr's August 11, 2010 lawsuit unequivocally demonstrates Husch's use of Veris report to substantiate its exoneration by stating, *"On April 29, 2011, the Trustee through his counsel refused Orr's demands [to fund the shareholder derivative lawsuit] advising him that the Trustee's forensic accounting expert [Veris] has determined that Brooke was insolvent long before Albert Riederer was appointed Special Master and, therefore, the claims in Orr v. Special Master [the shareholder derivative lawsuit] are without merit because nothing the Special Master did or failed to do could have damaged the shareholders' interest in a corporation already insolvent."* (Page #5, Doc #4, Case #11-6147).

232.     Husch was successful in blocking shareholder derivative allegations which implicated Husch (Doc #4, KSB #11-6147) and the shareholder derivative suit languished.

**Use of Bankruptcy Estate Assets to Financially Starve Orr to Deny Legal Representation and to Prevent the Filing of this Complaint**

233.     Husch used bankruptcy estate assets to squash Orr's opposition to Husch (including the filing of this Complaint) by financially starving Orr.

234.     Husch financially starved Orr by filing adversary proceedings against Orr and his family using bankruptcy estate assets.

235.     Husch financially starved Orr by using bankruptcy estate assets to object to Orr's bankruptcy claim for repayment of a $12 million promissory note. Husch's objection was based on the adversary proceeding Husch filed against Orr's family which in turn was based on a cause of action exonerating Husch which in turn was based on Veris' discredited opinion.

**Orr's Regulatory Complaints to the U.S. Trustee regarding Husch's use of Bankruptcy Estates to Impact, Delay and Impede this Complaint**

236.     The Chapter 7 Trustee's Handbook compiled by the Department of Justice (www.justice.gov/ust) identifies the primary role of the U.S. Trustee as the *"watchdog over the bankruptcy process.*" The associated responsibilities include *"Appointing and supervising private trustees who administer Chapter 7, 12, and 13 bankruptcy estates…"* and *"Ensuring that bankruptcy estates are administered promptly and efficiently, and that professional fees are reasonable".* The U.S. Trustee is assigned these

responsibilities so that bankruptcy participants can rely on the U.S. Trustee to protect them and prevent the intimidation and financial starving of participants by a conflicted trustee with access to the estate's "*piggy bank*" and use of the trustee's litigation discretion.

237.    Orr disclosed intimidation concerns to the U.S. Trustee in an August 24, 2010 letter by stating, "*I have been reluctant to press this matter because [the trustee] has demonstrated that he will use his trustee position to harass me with adversary and other actions to disparage me and deflect my criticism of his pre-petition conduct."* (Exhibit A).

238.    Orr has repeatedly requested the U.S. Trustee to investigate the conflicts of interest in Husch's administration of the Brooke Corporation bankruptcy estates resulting from the allegations reasserted in this Complaint. However, the U.S. Trustee system is either broke or regulators are incapable of supervising administration of a larger bankruptcy estate (Exhibit A).

239.    Orr made at least five separate written complaints to the U.S. Trustee based on the allegations reasserted in this Complaint (Exhibit A).

240.    Orr's June 9, 2010 letter to the U.S. Trustee raised the issue that the special master (and therefore Husch) should not be employed by the Brooke Corporation bankruptcy estate due to (among other transgressions) Husch's refusal to address, "*...destructive conflicts of interest raised by the companies' boards of directors...*" (Exhibit A). The U.S. Trustee did not investigate.

241.    Orr's August 24, 2010 letter to the U.S. Trustee again complained of conflicts of interest and described actions taken by the special master (and therefore Husch) to harass and disparage Orr as the result of Orr's August 11, 2010 lawsuit against the special master for causing the losses which resulted in Brooke Corporation's bankruptcy filing. Orr also complained that the special master did not meet the criteria for a "*disinterested person*" (Exhibit A). The U.S. Trustee did not investigate.

242.    Orr's November 26, 2011 letter was sent to the U.S. Trustee immediately upon notification to bankruptcy participants that a Husch partner had been appointed chapter 7 trustee of the Brooke Corporation bankruptcy estate. This letter asked sixteen specific questions regarding the suitability of a Husch partner to serve as chapter 7 trustee (including questions regarding an internal "*Chinese Wall*") (Exhibit A). The U.S. Trustee did not investigate.

243.    Orr's July 22, 2013 letter was a follow up to a December 23, 2011 complaint filed by Orr with the Office of Inspector General of the Department of Justice complaining of failed supervision of the Brooke Corporation bankruptcy estate by the U.S. Trustee (Exhibit A).  This complaint was referred back to the U.S. Trustee who did not investigate.

244.    Orr's September 10, 2013 letter repeated his request for the U.S. Trustee to investigate Husch's conflicts of interest because the issue had been raised by other bankruptcy participants in corporate governance litigation (Exhibit A).  The U.S. Trustee did not investigate.

245.    On September 28, 2015 Orr filed a supplemental brief describing the lackadaisical supervision of Husch by the U.S. Trustee.  The supplemental brief addressed the supervisory failures of the U.S. Trustee and the U.S. Trustee's failure to address Orr's regulatory complaints (Doc #5496, KSB #08-22786).

246.    Orr provided the U.S. Trustee with a copy of Orr's supplemental brief regarding the lackadaisical supervision of Husch (Doc #5496, KSB #08-22786), to which the U.S. Trustee responded that "*it takes no position*" regarding Husch's conflicts of interests (Doc #5494, KSB #08-22786).

247.    The U.S. Trustee filed a brief on February 2, 2016 in which it changed its position from "*no position*" to the position of advocating for Husch (Doc #5626, Case #08-22786).  Orr filed a February 22, 2016 reply brief arguing that the U.S. Trustee's brief on its revised position was a hodge podge of inaccuracies and irrelevancies that further substantiated Orr's assertion that the U.S. Trustee failed its supervisory responsibilities (Doc #5650, Case #08-22786).

248.    The U.S. Trustee has not investigated or researched Orr's regulatory complaints or filed briefs.

### COUNT I

**Malpractice and Breach of Fiduciary Duties**

249.    Orr re-alleges paragraphs 1-248 as if fully set forth herein.

250.    Husch had privity with Orr.

251.    Husch owed Orr a duty of care.

252.    Husch breached its duty of care to Orr.

253.    Husch's breach caused a pecuniary and forseeable injury to Orr.

254.   Husch showed a conscious and voluntary disregard of the need to use reasonable care, which caused foreseeable grave injury to Orr.

255.   Husch's malpractice was a conscious and voluntary act in reckless disregard of its legal duty and of the consequences to Orr.

256.   Husch's malpractice includes its failure to comply with District Court orders assigning special master duties and granting powers to perform those duties.

257.   Husch's malpractice includes its failure to address, or even discuss, Orr's Protests.

258.   Husch's malpractice includes its failure to consult with Orr as the primary defendant consenting to the employment of Husch.

259.   Husch's malpractice is more egregious than the malpractice of Kutak Rock, LLP.

260.   Orr was damaged as a direct and proximate result of Husch's malpractice.

WHEREFORE, Orr prays that the Court enter judgment in favor of Orr and against Husch for damages, costs and other appropriate relief for their acts of malpractice and breach of fiduciary duties which are in excess of $75,000.

## COUNT II

**Gross Negligence and Intentional Misconduct**

261.   Orr re-alleges paragraphs 1-260 as if fully set forth herein.

262.   Husch had privity with Orr.

263.   Husch owed Orr a duty of care.

264.   Husch breached its duty of care to Orr.

265.   Husch's breach caused a pecuniary and forseeable injury to Orr.

266.   Husch showed a conscious and voluntary disregard of the need to use reasonable care, which caused foreseeable grave injury to Orr.

267.   Husch's gross negligence was a conscious and voluntary act in reckless disregard of its legal duty and of the consequences to Orr.

268.    Husch's gross negligence includes it intentional disregard of Orr's Protests which clearly stated that Husch's refusal to immediately use franchise royalties for payment of franchise support expenses to continue uninterrupted franchise support would cause significant losses for Orr and thousands of others.

269.    Husch's gross negligence includes its intentional misuse of special master powers for purposes other than the duties assigned to the special master.

270.    Husch's gross negligence includes its intentional misuse of special master powers to hoard franchise royalties for subsequent payment to Husch instead of immediately paying franchise royalties to franchise servicers to provide uninterrupted franchise support.

271.    Husch's gross negligence includes its intentional refusal to use special master powers to perform the first assigned duty of the special master to ensure the status quo.

272.    Husch's gross negligence includes its intentional refusal to use special master powers to perform the assigned secondary duties of the special master.

273.    Husch's gross negligence includes its intentional misuse of special master powers to interfere in the corporate governance of Brooke Corporation and Brooke Capital by Orr as a director.

274.    Husch's gross negligence includes its intentional misuse of special master powers to deny legal representation to Orr.

275.    Orr was damaged as a direct and proximate result of Husch's gross negligence.

276.    These negligent acts rise to the level of intentional misconduct, because Husch had actual or constructive knowledge of the perils of his actions as demonstrated by Orr's Protests.

WHEREFORE, Orr prays that the Court enter judgment in favor of Orr and against Husch for actual damages, punitive damages, costs and other appropriate relief for their acts of gross negligence which are in excess of $75,000.

## COUNT III

**Fraud by Intentionally Concealing Facts to Avoid Scrutiny of its Hoarding of Franchise Royalties**

277.    Orr re-alleges paragraphs 1-276 as if fully set forth herein.

278.    Husch omitted, and therefore misrepresented, the material fact that franchise royalties were being hoarded for the purpose of paying Husch fees.

279.    Husch's omission regarding the hoarding and use of franchise royalties represented a falsehood.

280.    Husch failed to correct the assertions in Orr's Protests that franchise royalties were being hoarded for the purpose of resolving Orr's dispute with securitization investors.

281.    Husch's failure to correct the assertions in Orr's Protests regarding the use of franchise royalties represented a falsehood.

282.    Husch's concealment of its hoarding of franchise royalties for payment of Husch's fees was material.

283.    Husch knowingly concealed its hoarding of franchise royalties for payment of Husch's fees.

284.    Husch intended for Orr to believe that the hoarding of franchise royalties occurred to facilitate dispute resolution with securitization investors because Husch knew that Orr would act even more urgently to protect franchise royalties that were used to pay Husch's fees.

285.    Husch failure to respond or discuss Orr's Protests against hoarding of franchise royalties for payment to securitization investors kept Orr unaware of Husch's falsehood regarding use of franchise royalties for payment to Husch.

286.    Orr relied on Husch to make truthful statements regarding the hoarding, and subsequent use, of franchise royalties.

287.    Orr had a right to rely on Husch's statements.

288.    Orr was damaged as a direct and proximate result of Husch's concealment of their intent to hoard franchise fees to pay Husch fees.

WHEREFORE, Orr prays that the Court enter judgment in favor of Orr and against Husch for actual damages, punitive damages, costs and other appropriate relief for their acts of fraud which are in excess of $75,000.

## COUNT IV

**Fraud by Intentionally Concealing Orr's Protests to Engineer Husch's Appointment as Bankruptcy Estates Legal Counsel**

289.    Orr re-alleges paragraphs 1-288 as if fully set forth herein.

290.    Husch failed to disclose Orr's Protests to the District Court as required by the District Court's order appointing the special master.

291.    Husch failed to disclose Orr's Protests to the Bankruptcy Court as required by bankruptcy rules and the Model Rules of Professional Conduct.

292.    Husch's omissions represented a falsehood.

293.    Husch's concealment of Orr's Protests was material.

294.    Husch knowingly concealed Orr's Protests.

295.    Husch would not have been appointed to serve the Brooke Corporation bankruptcy estates if it had properly disclosed Orr's Protests.

296.    Husch's refusal to discuss Orr's Protests with Orr kept Orr ignorant of Husch's concealment of Orr's Protests.

297.    Because Husch caused Orr to be unrepresented by legal counsel, Orr relied on Husch to make full and complete disclosure to the District Court of Orr's Protests with the expectation that the District Court would address Orr's Protests.

298.    Because Husch caused Orr to be unrepresented by legal counsel, Orr relied on Husch to make full and complete disclosure to the Bankruptcy Court of Orr's Protests with the expectation that the Bankruptcy Court would address the conflicts of interest resulting from Orr's Protests.

299.    Orr had a right to rely on Husch to make proper disclosures.

300.    Orr was damaged as a direct and proximate result of Husch failure to disclose Orr's Protests.

WHEREFORE, Orr prays that the Court enter judgment in favor of Orr and against Husch for actual damages, punitive damages, costs and other appropriate relief for their acts of fraud which are in excess of $75,000.

## COUNT V

**Fraud by Intentionally Omitting Cause of Action against Husch as an Asset in Bankruptcy Schedules Prepared by Husch**

301.    Orr re-alleges paragraphs 1-300 as if fully set forth herein.

302.     Orr's Protests describe a cause of action against Husch by the Brooke Corporation bankruptcy estates which is an asset of the bankruptcy estates.

303.     Husch failed to disclose an asset for a cause of action against Husch in the bankruptcy schedules prepared by Husch for Brooke Corporation and Brooke Capital

304.     Husch's omissions represented a falsehood.

305.     Husch's concealment of an asset for a cause of action by the bankruptcy estates against Husch was material.

306.     Husch knowingly concealed the asset for a cause of action by the bankruptcy estates against Husch.

307.     Because Husch caused Orr to be unrepresented by legal counsel, Orr relied on Husch to fully and accurately complete the bankruptcy schedules for Brooke Corporation and Brooke Capital.

308.     Orr had a right to rely on Husch to fully and accurately complete the bankruptcy schedules for Brooke Corporation and Brooke Capital.

309.     Orr was damaged as a direct and proximate result of Husch failure to fully and accurately complete the bankruptcy schedules for Brooke Corporation and Brooke Capital.

WHEREFORE, Orr prays that the Court enter judgment in favor of Orr and against Husch for actual damages, punitive damages, costs and other appropriate relief for their acts of fraud which are in excess of $75,000.

## COUNT VI

**Unjust Enrichment of Husch from use of Franchise Royalties for Payment to Husch which Denied Benefits to Orr.**

310.     Orr re-alleges paragraphs 1-309 as if fully set forth herein.

311.     Husch was unjustly enriched in the amount of fees paid to Husch from franchise royalties which were required by a July 1, 2006 Master Agent Security Agreement to be used for payment of franchise support expenses.

312.     Orr suffered impoverishment from the cessation of franchise support because it denied Orr of the professional and personal benefits he would have received from continuation of franchise support.

47

313.    Orr's impoverishment significantly exceeded Husch's enrichment because the cessation of franchise support caused significant professional and personal losses to Orr.

314.    Husch had no justification for its enrichment and for Orr's resulting impoverishment.

WHEREFORE, Orr prays that the Court enter judgment in favor of Orr and against Husch for the amount of their unjust enrichment, costs and other appropriate relief for their acts of unjust enrichment which are in excess of $75,000.

## COUNT VII

**Conversion by Husch of Funds Due to Orr and other Beneficiaries of Trust Administered by BNYM**

315.    Orr re-alleges paragraphs 1-314 as if fully set forth herein.

316.    In litigation resulting in the special master appointment, Bank of New York Mellon ("BNYM") identified Orr as the most significant person of the "Brooke Parties" who were beneficiaries of the trust administered by BNYM.

317.    A July 1, 2006 Master Agent Security Agreement with BNYM also identifies Orr as a beneficiary of the trust administered by BNYM.

318.    As the most significant person of the "Brooke Parties", Orr was a beneficiary of the trust administered by BNYM.

319.    Husch hoarded franchise royalties for subsequent conversion of franchise royalties from Orr, as a beneficiary of the BNYM administered trust, to Husch in direct violation of the July 1, 2006 Master Agent Security Agreement with BNYM.

320.    Husch's hoarding of franchise royalties for subsequent conversion of franchise royalties for its own use resulted in the improper cessation of franchise support which relied on franchise royalties for payment of support expenses.

321.    Husch, acting on behalf of the Brooke Corporation special master estate, did not disclose to the District Court that Husch's fees were being paid from the assets of a trust administered by BNYM.

322.    Husch, acting on behalf of the Brooke Corporation bankruptcy estates, did not disclose to the District Court that Husch's fees were being paid from the assets of a trust administered by BNYM.

323.    Husch hoarding of franchise royalties for subsequent conversion of franchise royalties for its own use resulted in personal and professional damages to Orr.

WHEREFORE, the Plaintiff prays that the Court enter judgment in favor of Orr and against Husch for damages, costs and other appropriate relief for their acts of conversion which are in excess of $75,000.

Respectfully submitted,

Robert D. Orr

**JURY DEMAND** Robert D. Orr hereby demands a jury trial on all issues so triable in this matter.

Dated: October 3, 2016

Respectfully submitted,

Robert D. Orr